**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

JOHN DOE (A No. 246-243-025),

Petitioner,

v.

CHESTNUT, et al.,

Respondents.

Case No. 1:26-cv-00593-JLT-FJS

ORDER WITHDRAWING REFERENCE TO THE ASSIGNED MAGISTRATE JUDGE; GRANTING PETITIONER'S MOTION TO PROCEED PSEUDONYM; DENYING THE PETITION FOR WRIT OF HABEAS CORPUS; DENYING THE MOTION FOR IMMEDIATE RELEASE; GRANTING RESPONDENTS' MOTION TO LIFT THE NO TRANSFER ORDER; AND DIRECTING THE CLERK OF COURT TO CLOSE THE CASE

(Docs. 1, 5, 18, 19, 20)

John Doe[1] is a federal immigration detainee proceeding with a pending habeas petition pursuant to 28 U.S.C. § 2241 challenging his ongoing detention. (Doc. 1.) This matter was initially referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. (Doc. 5.) In the interest of justice and to promote judicial efficiency, the undersigned hereby withdraws that reference, and for the reasons set forth below, **DENIES** the petition for writ of habeas corpus.

## I. FACTUAL & PROCEDURAL BACKGROUND

Petitioner is from Russia. (Doc. 1-3, ¶ 2.) In December 2021, Petitioner and his family

[1] For the reasons set forth below, Petitioner's motion to proceed via pseudonym is **GRANTED**.

fled Russia for Turkey after Petitioner was targeted by Russian police for being an ethnically Ingush Muslim. (*Id.* at ¶¶ 2, 6, 7; *see also* Doc. 1, ¶¶ 20, 22.) According to Petitioner, prior to fleeing Russia, he was arrested by the Russian Federal Security Services in 2017 "based on [a] fabricated weapons charge as part of a counter-insurgency campaign against Ingush Muslims" and tortured while in their custody. (Doc. 1, ¶ 20.) Petitioner indicates that he refused to falsely confess to crimes he did not commit but was nonetheless convicted by a Russian judge for possessing a grenade, which he claims was planted on him. (*Id.*; *see also* Doc. 17-1 at 13) Following his conviction and release from house arrest, Russian officials continued to target, surveillance, and torture the Petitioner, which prompted his ultimate departure to Turkey in December 2021. (Doc. 1, ¶ 20.)

After a year in Turkey, Petitioner left in December 2022 for the United States because Turkey denied him residency and he feared they would deport him back to Russia. (Doc. 1, ¶ 22; Doc. 1-3, ¶¶ 7–9.) Because he did not have money to pay for his family's travel, his wife and children returned to Russia from Turkey. (Doc. 1-3, ¶ 7.) According to Petitioner, he sought asylum and safety in the United States. (Doc. 1, ¶ 22.) Petitioner used an individual named Mohamed Dakiev's services to secure travel from Turkey to Mexico after seeing an advertisement offering his commercial migration services. (*Id.* at ¶ 23.) Petitioner paid Dakiev to obtain a visa and ticket to Mexico. (*Id.*) According to Respondents, Mohamed Dakiev is the same individual as Muhammad Dakiev, a suspected Islamic State-Khorasan Province ("ISIS-K") human smuggler and terrorist believed to have participated in the January 28, 2024, ISIS-K attack on the Santa Maria Church in Istanbul, Turkey. (*See* Doc. 8-1, ¶ 17.) ISIS-K is a designated foreign terrorist organization. (*Id.*)

After arrangements were made, Petitioner traveled to Mexico and unlawfully entered the United States on December 16, 2022, near the Yuma, Arizona border. (Doc. 1-3, ¶ 9; *see also* Doc. 8-1 at 8.) At that time, U.S. Customs and Border Patrol encountered the Petitioner and took him into custody. (Doc. 8-1 at 8.) On December 19, 2022, the Department of Homeland Security charged Petitioner as removable under Section 212(a)(6)(A)(i) of the Immigration and Nationality Act. (*Id.* at 11.) The next day, DHS released the Petitioner on an Order of Release on

Recognizance pursuant to Alternatives to Detention ("ATD"). (*Id.* at 17.) Petitioner indicates that after his release, he applied for asylum, complied with his ATD reporting requirements, and attended all his immigration court proceedings. (Doc. 1, ¶ 28.)

Approximately nine months later, on September 22, 2023, DHS conducted a targeted enforcement action to locate the Petitioner using his ATD monitoring device. (Doc. 8-1 at 24.) That day, DHS located and arrested the Petitioner pursuant to an administrative warrant. (*See id.*) Petitioner later learned that he was arrested because DHS considered him "an individual of national security concern by virtue of [his] travel to the Untied States via a migration pathway that has connections to individuals with a nexus to a foreign terrorist organization." (Doc. 1, ¶ 31; *see also* Doc. 1-8 at 1–2.) Approximately nine months after his arrest, on June 17, 2024, Petitioner received a bond hearing pursuant to 8 U.S.C. § 1226(a) and 8 C.F.R. § 1236. (Doc. 8-1 at 29.) The Immigration Judge denied release on bond because Petitioner failed to meet his burden of proving he was not a danger or a flight risk. (*Id.*) Petitioner appealed that bond determination to the Board of Immigration Appeals but later withdrew the appeal. (*Id.* at 56–57.)

On April 22, 2025, the IJ granted Petitioner's application for asylum, finding that he had testified credibly, had established past persecution on account of his actual and imputed political opinion, and that DHS failed to rebut the presumption of future persecution in Russia. (*See* Doc. 1-7 at 1–31.) The IJ granted asylum given Petitioner's lack of criminal history in the U.S. and significant evidence showing he had been framed for his sole offense in Russia. (*See id.*) On April 29, 2025, Petitioner requested a second bond hearing based on changed circumstances after the IJ granted his asylum application. (Doc. 8-1 at 60–62.) That bond hearing was scheduled for May 8, 2025, but on the date of the hearing, Petitioner withdrew his request to rebut DHS's newly presented evidence with a written declaration. (*Id.* at 68; Doc. 1, ¶ 53.) On June 30, 2025, Petitioner renewed his request for a second bond hearing, (Doc. 1, ¶ 54; Doc. 8-1 at 71–74), but the IJ denied his request on July 14, 2025, for lack of jurisdiction. (*See* Doc. 1, ¶ 55; Doc. 1-11 at 1 (citing *Matter of Q. Li*, 29 I.&N. Dec. 66, 67–71 (BIA 2025).) Petitioner appealed that bond determination to the BIA, and the BIA affirmed the IJ's decision on January 16, 2026, finding that under *Matter of Yajure Hurtado*, 29 I.&N. Dec. 216, 220–28 (BIA 2025), Petitioner was an

"applicant for admission" ineligible for release on bond. (*See* Doc. 1, ¶ 55; Doc. 1-12 at 1–2.)

Meanwhile, on May 21, 2025, DHS appealed the IJ's grant of asylum to the BIA. (Doc. 1, ¶ 52.) On October 8, 2025, the BIA sustained DHS's appeal and remanded the case to the IJ for further proceedings. (*See* Doc. 17-1 at 3.) The BIA explained that the underlying IJ decision failed to "contain sufficient factual findings or legal analysis regarding whether the national security bar applied in [Petitioner's] case." (*See id.*) On remand, on July 27, 2026, the IJ denied Petitioner's request for asylum, withholding of removal, and convention against torture relief, and ordered Petitioner removed to Russia. (*Id.* at 2–37.) Petitioner did not appeal that decision within the thirty-day window as required under applicable regulations.[2] (Doc. 18 at 1; Doc. 20 at 3); *see* 8 C.F.R. § 1003.38(b)(2) ("In cases where an Immigration Judge has adjudicated an asylum application and did not deny the application under 208(a)(2)(A), (B), or (C) of the Act, the Notice of Appeal from a Decision of an Immigration Judge . . . shall be filed directly with the Board within 30 calendar days of the Immigration Judge's decision.") Because the thirty-day window to file such appeal has passed, Petitioner's order of removal is now final. *See* 8 C.F.R. § 1241.1(c) ("An order of removal made by the immigration judge at the conclusion of proceedings under section 240 of the Act shall become final: Upon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time").

Petitioner is detained at California City Detention Facility and has remained in ICE custody for approximately three years, since September 2023. (*See* Doc. 1, ¶¶ 31, 56.) On January 23, 2026, Petitioner filed a petition for writ of habeas corpus challenging his detention as unduly prolonged in violation of the Fifth Amendment Due Process Clause. (*See* Doc. 1, ¶¶ 62–118.) However, considering Petitioner's final order of removal, he now concedes that his detention authority has shifted to 8 U.S.C. § 1231. (*See* Doc. 20 at 3 ("After three years of brutal conditions in ICE detention, Petitioner made the impossible choice not to appeal the IJ's decision despite his meritorious claim. . . His unchallenged removal order is now final, allowing his imminent return to Russia."); Doc. 25 at 3 ("Petitioner does not deny that he is subject to detention under 8 U.S.C.

---

[2] A routine review of Petitioner's EOIR's automated case information confirms that he was ordered removed by an IJ on July 27, 2026, and that no appeal was received for this case. *See* EOIR, Automated Case Information, https://acis.eoir.justice.gov/en/caseinformation (last visited November 17, 2026).

§ 1231.”)) Despite this, Petitioner argues that he is entitled to 60 days of liberty to facilitate his own departure to Russia, obtain laser corrective eye surgery that is unavailable in Russia, and say goodbye to loved ones in the United States. (*See* Doc. 20 at 5–13.) Specifically, Petitioner indicates that if removed to Russia by ICE flight, he will be at “grave risk of indefinite detention, torture, or worse” and that he requires corrective eye surgery after “‘going blind’ from torture-related eye damage.” (*Id*. at 10.) Petitioner asks to “buy his own plane ticket to Moscow, through a third country . . . to appear as ‘just another Russian national on his way home’ rather than an American asylum-claimant with a Russian criminal record.” (*Id*.)

Respondents oppose Petitioner’s request for release because he is mandatorily detained under 8 U.S.C. § 1231(a)(2) for a presumptively reasonable six-month period, there are no impediments to effectuating his removal to Russia, and he poses a significant national security concern due to his connection to a suspected ISIS-K human smuggler. (Doc. 24 at 1–5.) Instead, Respondents request this Court lift its temporary order prohibiting Petitioner’s removal during the pendency of his habeas proceedings because Petitioner, who holds a valid Russian passport, may be imminently removed pursuant to his removal order. (Doc. 18 at 1–2; *see* Doc. 18-2 at 1.) Petitioner’s reply argues that he is nonetheless entitled to temporary release because his detention has become unconstitutionally prolonged, he has been denied necessary eye surgery while in detention, he has been denied release on bond for lack of jurisdiction, he does not pose a national security risk, and there is no jurisdictional bar to the Court’s review of Petitioner’s claims as they relate to his final order of removal. (Doc. 25 at 2–10.)

## II. LEGAL STANDARD

The Constitution guarantees that the writ of habeas corpus is “available to every individual detained within the United States.” *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art I, § 9, cl. 2). Section 2241 of Title 28 confers the federal courts with the power to issue writs of habeas corpus to persons “in custody in violation of the Constitution or laws or treaties of the United States.” 28 U.S.C. § 2241. This includes challenges by non-citizens in immigration-related matters. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *see also A.A. R. P. v. Trump*, 145 S. Ct. 1364, 1367 (2025).

## III. DISCUSSION

### A. Petitioner's Motion to Proceed Via Pseudonym

Petitioner asks this Court to permit him to proceed via pseudonym using the name "John Doe" to protect him from the risk of persecution and retaliation by Russian officials. (Doc. 19 at 3–5.) Petitioner asserts that relevant factors weigh in favor of granting his motion because the litigation concerns sensitive personal information—including Petitioner's asylum claim and information regarding past torture in Russia, as well as Petitioner's alleged connection to a terrorist organization—and allowing him to proceed via pseudonym serves the public interest and does not prejudice Respondents. (*Id*. at 3–8.) "To determine whether to allow a party to proceed anonymously when the opposing party has objected, a district court must balance five factors: '(1) the severity of the threatened harm, (2) the reasonableness of the anonymous party's fears . . . (3) the anonymous party's vulnerability to such retaliation,' (4) the prejudice to the opposing party, and (5) the public interest.'" *See Doe v. Kamehameha Schools/Bernice Pauahi Bishop Est.*, 596 F.3d 1036, 1042 (9th Cir. 2010) (enumerating five factors the district court must consider when deciding whether to grant a motion for pseudonym) (citation omitted).

The Court has reviewed Petitioner's unopposed motion and finds the reasons advanced for proceeding under pseudonym warrant granting the requested relief. As Respondents do not identify any actual, threatened, or risk of material prejudice that could result from Petitioner's use of a pseudonym (*see* Doc. 19 at 7), the Court finds that Respondents would not suffer prejudice if Petitioner were allowed to proceed under pseudonym. The Court is mindful of the public's interest in knowing the identity of the parties. However, upon weighing the reasonableness of Petitioner's fears relating to the sensitive nature of his asylum claims and fear of persecution; the lack of prejudice to Respondents; and the public interest in this action, the Court finds that Petitioner's need for anonymity outweighs the competing interest. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000) (citation omitted); *Doe v. Andrews*, No. 1:25-CV-00333-JLT-HBK (HC), 2025 WL 1531684 (E.D. Cal. May 28, 2025) (noting that "Courts regularly grant leave to proceed under a pseudonym in cases related to asylum proceedings," collecting cases, and granting immigration detainee's pseudonym request).

Thus, the motion for pseudonym is **GRANTED**.

**B. Jurisdictional Bar Under 8 U.S.C. § 1252(g)**

As a threshold matter, Respondents argue that this Court lacks jurisdiction under 8 U.S.C. § 1252(g) and § 1252(a)(5) to review Petitioner's request for temporary release from ICE custody to "self-deport" back to Russia. (Doc. 24 at 3–4.) According to Respondents, the relief Petitioner seeks "would necessarily have the effect of finding Petitioner's removal order invalid or at least unable to be effectuated." (*Id*. at 3.) Thus, Respondents argue that the Court lacks jurisdiction to hear such indirect challenges to Petitioner's removal order. (*Id*.) The Court disagrees.

Section 1252(g) precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g). However, Petitioner does not seek to invalidate his removal order or inhibit the government's ultimate execution of his removal order. (*See* Doc. 20 at 5–13.) Instead, he contests the manner of departure from the United States and his continuous detention pending his ultimate removal. (*See id*.) Petitioner indicates that he intends to self-deport in full compliance with his removal order but seeks to do so in a way that accords with due process. (*Id*. at 5, 10–13.) Instead, the central issue here involves Petitioner's manner of departure and his continued detention pending his removal; therefore, the Court has authority to review his claims. *See Ceesay v. Kurzdorfer, et al.*, 781 F. Supp. 3d 137, 150–52 (W.D.N.Y. 2025) ("After all, detention under or in connection with a final order of removal always is related to the execution of an immigration order, but courts routinely hear habeas petitions filed by individuals subject to a final order of removal. Indeed, in *Zadvydas*, the Supreme Court explicitly held that "[section] 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention.") (citing *Zadvydas*, 533 U.S. at 688).

Additionally, 8 U.S.C. § 1252(a)(5)'s jurisdictional bar, which confers exclusive jurisdiction to the court of appeals when reviewing challenges to removal orders, is inapplicable. Petitioner is not contesting the IJ's decision to deny asylum or order his removal. (*See* Doc. 17-1 at 37.) Instead, Petitioner declined to appeal that decision to the BIA because he would rather return to Russia than to remain detained. (*See* Doc. 20 at 3.) Thus, he does not raise an indirect

challenge to his removal order. *Cf. Martinez v. Napolitano*, 704 F.3d 620, 622–23 (9th Cir. 2012) (explaining that the petitioner's APA claims raised before the district court, which challenged the BIA's determination regarding his ineligibility for asylum, withholding of removal, and CAT relief were "nothing more than indirect attacks on is order of removal").

**C. Mandatory Detention Under 8 U.S.C. § 1232(a)(2)**

An IJ denied Petitioner's asylum application and ordered him removed on July 27, 2026. (Doc. 17-1 at 37.) Petitioner did not file an appeal within the thirty-day window as required under applicable regulations and his order of removal is now final. (Doc. 20 at 3); *see* 8 C.F.R. § 1003.38(b)(2); 8 C.F.R. § 1241.1(c) (an order of removal becomes final "[u]pon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time"). Thus, Petitioner's detention is now governed by 8 U.S.C. § 1231(a)(2) and Petitioner is subject to mandatory detention during a ninety-day removal period, as set forth in 8 U.S.C. §§ 1231(a)(1)(A), (a)(2)(A). Additionally, the Supreme Court has explained that under these provisions, the government may detain a removable noncitizen beyond the 90-day statutory removal period, but only for so long as "*reasonably necessary* to secure the alien's removal," which is presumptively reasonable for a period of six months. *Zadvydas v. Davis*, 533 U.S. 678, 683, 701 (2001). Petitioner's removal order became final on or around August 26, 2026. (*See* Doc. 17-1); *see also* 8 C.F.R. § 1241.1(c). Therefore, his current detention under § 1231(a)(2) has not yet exceeded that presumptively reasonable period of confinement. *Zadvydas*, 533 U.S. at 683, 701.

Petitioner nonetheless argues that mandatory detention under § 1231(a)(2), as applied to him, is unconstitutional because he has suffered prolonged detention under § 1226(a), (e.g., a total detention period of three years). (*See* Doc. 25 at 3.) The Court rejects such argument. Petitioner was originally detained under 8 U.S.C. § 1226(a) during the pendency of his removal proceedings and received a bond hearing during his initial period of confinement. (*See* Doc. 8-1 at 29.) The IJ denied release on bond after finding that Petitioner failed to prove he was not a flight risk or danger. (*Id.*) Later, the IJ denied Petitioner's request for a second bond hearing based on lack of jurisdiction and the BIA affirmed. (*See* Doc. 1-11 at 1; Doc. 1-12 at 1–2.)

This Court would have otherwise found that Petitioner's prior encounter with immigration officials and release on recognizance upon entry into the United States entitled him to a post-deprivation bond hearing under 8 U.S.C. § 1226(a) where the government bore the burden of proving flight risk or danger. (*See* Doc. 8-1 at 8, 17); *see e.g.*, *J.S.H.M. v. Wofford*, No. 1:25-cv-01309-JLT-SKO, 2025 WL 2938808, at *1, 6–8, 10–18 (E.D. Cal. Oct. 16, 2025); *M.R.R. v. Chestnut*, No. 1:25-cv-01517-JLT, 2025 WL 3265446, at *1, 6–14 (E.D. Cal. Nov. 24, 2025). However, when Petitioner's order of removal became administratively final, his detention authority shifted from 8 U.S.C. § 1226(a) to 8 U.S.C. § 1231(a)(2). Thus, to the extent Petitioner attempts to challenge his prolonged detention under § 1226(a), his claim is moot. "A petition challenging detention under section 1226 is rendered moot when detention authority shifts to section 1231." *Baires v. Lynch*, No. C 15-03635 RS, 2016 WL 4502558, at *2 (N.D. Cal. Aug. 29, 2016); *see also Ortega v. Warden of Golden State Annex ICE Detention Facility*, No. 1:25-cv-01856-DAD-CSK, 2026 WL 836323, at *2 n.2 (E.D. Cal. Mar. 25, 2026); *Aguilar Garcia v. Kaiser*, No. 3:25-cv-05070-JSC, 2025 WL 2998169, at *2 (N.D. Cal. Oct. 24, 2025) (finding that the detention authority applicable to the petitioner had changed to § 1231 when his removal order became final).

**D. Petitioner's Request for a Narrow Period of Release to Self-Deport and Obtain Necessary Medical Treatment**

Petitioner argues that despite his final order of removal and mandatory detention under § 1231(a)(2), he is nonetheless entitled to a period of release for sixty days to self-deport and obtain necessary medical treatment, as well as to say goodbye to loved ones. (Doc. 20 at 5–13.) The Court rejects these arguments.

First, the cases Petitioner cites for this proposition are inapposite. (*See* Doc. 20 at 8–9.) Those cases involve petitioners who were released under orders of supervision ("OSUP") *with final orders of removal* because they could not be repatriated to their home countries and thus, had a weighty liberty interest in remaining out of custody after living peacefully in the U.S. for years. These petitioners were in full compliance with their conditions of release, had pending motions to reopen, presented no flight risk or danger, and upon re-detention could not be

deported. *Cf. Nak Kim Chhoeun v. Marin*, No. SACV 17-01898-CJC (GJSx), 2018 WL 1941756, at *2–3, 5–7 (C.D. Cal. Mar. 26, 2018) (explaining that for fourteen years after his removal order was issued, petitioner worked and lived in the country, had complied with his release conditions, posed no danger or flight risk, had a pending motion to reopen, and had a liberty interest in remaining out of custody while his motion to reopen remained pending); *Dominguez Fernandez v. Acuna, et al.*, No. 26-375-SDD-RLB, 2026 WL 2546662, at *1–6 (M.D. La. Aug. 27, 2026) (explaining that after six years of release on supervision, the government abruptly revoked petitioner's release and could not show a significant likelihood of removal to either Cuba, his home country, or Mexico, his designated third-country); *Omar v. U.S. Immigr. & Customs Enf't*, No. 26-00443-BAJ-EWD, 2026 WL 1663009, at *2–3, 4–11 (M.D. La. May 29, 2026) (explaining that the government released the petitioner on supervision after being unable to deport him and then revoked his release twenty years later, despite his full compliance with his release conditions and despite the government's present inability to deport him).

Unlike these cases, Petitioner was ordered removed while in ICE custody, and ICE has not released him on an order of supervision due to an inability to repatriate him to Russia. To the contrary, Respondents indicate that Petitioner has a valid Russian passport and that there is no legal impediment to his removal. (*See* Doc. 5; Doc. 18; Doc. 18-2 at 1.) Additionally, unlike these cases, Petitioner has not been living at liberty in the United States but instead has been detained for the past three years while seeking asylum. (*See* Doc. 1, ¶ 31.) Only recently in July 2026, while still in ICE custody, did an IJ order Petitioner removed, and such order only recently became final in August 2026. (*See* Doc. 17-1 at 37); 8 C.F.R. § 1241.1(c). Thus, Petitioner remains detained under the initial period of post-removal detention. *Cf. Nguyen v. Hyde*, 788 F. Supp. 3d 144, 149 (D. Mass. June 20, 2025) ("This case is not about ICE's authority to detain in the first place upon an issuance of a final order of removal as in *Zadvydas*. This case is about ICE's authority to *re-detain* Mr. Nguyen after he was issued a final order of removal, detained, and subsequently released on an OSUP.").

Second, while Petitioner's eye damage may certainly require laser corrective eye surgery, it is unclear why Petitioner cannot obtain this surgery in Russia or how Petitioner would

otherwise afford such surgery in the United States, whereas here, his insurance does not cover this procedure and he cannot afford it out of pocket. (*See* Doc. 20 at 10.) More fundamentally, however, the cases cited by Petitioner for the proposition that he is entitled to sixty days of release to undergo corrective eye surgery are distinguishable. Those cases not only involved petitioners with weighty liberty interests due to prior release on OSUP, as explained above, but also involved petitioners with life threatening medical needs. *Cf. Omar*, 2026 WL 1663009, at *3, 7–11 (explaining that petitioner, who had a heart attack while in ICE custody and underwent a triple bypass open heart surgery, was previously released on OSUP for twenty years, and had no foreseeable removal was entitled to immediate release); *Dominguez Fernandez*, 2026 WL 2546662, at *2–7 (explaining that petitioner, who had a cardiac episode and abnormal EKG while in ICE custody, was previously released on OSUP for six years, and had no foreseeable removal was entitled to immediate release).[3]

Third, while Petitioner argues that he is entitled to "self-removal" or "self-deportation" allowing him to "depart at his own expense to a destination of his choice," he cites no substantive support for this proposition. (*See* Doc. 25 at 2, 7.) To begin, the regulation he cites in support of this argument is associated with a noncitizen formerly released on OSUP, which does not apply to Petitioner's case. (*Id*. at 7 (citing 8 C.F.R. § 241.5)); 8 C.F.R § 241.5(a) ("An alien released pursuant to § 241.4 shall be released pursuant to an order of supervision."); 8 C.F.R. § 241.5(b) ("An officer authorized to issue an order of supervision may require the posting of a bond in an amount determined by the officer to be sufficient to ensure compliance with the conditions of the

[3] Even by just looking at the case parentheticals included in Petitioner's reply, the Court finds such cases distinguishable as they appear to involve severe health concerns rising to a level necessitating immediate release. (*See* Doc. 25 at 3–4 ["Courts have granted release for individuals to address their dire medical concerns. *See Figueroa Balderrama v. Santacruz*, 5:26-cv-03258-SK, Dkt. 14 (C.D. Cal. Jun. 12, 2026) (ordering immediate release for petitioner due to his severe hemorrhoids); *Christy C.V. v. Warden*, 2026 WL 3026566, at *6–7 (E.D. Cal. Oct. 8, 2026) (ordering release for petitioner with throat cancer subject to mandatory detention under § 1226(c) due to grand theft conviction); *Doe v. Larose*, 2026 WL 2415261 at *1, 4 (S.D. Cal. Aug. 18, 2026) (petitioner with Interpol Red Notice ordered released due to bloody cough, blood in his urine stool, and abdominal pain); *Gutierrez Romo v. Chestnut*, 2026 WL 2254385 at *7 (E.D. Cal. Aug. 4, 2026) (petitioner with cancer subject to mandatory detention under § 1226(c) for domestic violence and drug conviction ordered released); *Cardenas Ramirez v. Warden*, 2026 WL 3015545 at *2, 9 (petitioner arrested for drug paraphernalia and DUI ordered released when suffering gastritis, migraines, and major depressive disorder)."].)

order, including surrender for removal.") (emphasis added); *see also Omar*, 2026 WL 1663009, at *4–13 (explaining that petitioner, whose OSUP was revoked was entitled to an orderly departure including the ability to "surrender to ICE once a travel document is obtained"). The other regulation Petitioner cites (Doc. 25 at 7) states: "A district director . . . may permit an alien ordered removed . . . to depart at his or her own expense to a destination of his or her own choice." 8 C.F.R. § 241.7. However, there is no indication that a district director has made such discretionary determination in this case, especially considering Petitioner's alleged national security risk. (*See* Doc. 24 at 5.)

Finally, even were this Court to accept the concept of "orderly departure" or the "freedom to say goodbye" as advanced by Petitioner (*see* Doc. 20 at 5–9), Petitioner fails to demonstrate why his case warrants such relief, especially considering the national security concerns raised in his case. *Cf. Ragbir v. Sessions*, No. 18-cv-236 (KBF), 2018 WL 623557, at *1–3 (S.D.N.Y. Jan. 29, 2018) (finding that the petitioner's abrupt re-detention after nine years of complying with his order of supervision violated due process, despite the government's then procurement of a valid travel document to effectuate his removal, because he had a liberty interest in an "orderly departure" and in "the freedom to say goodbye"), *vacated on other grounds and remanded sub nom. Ragbir v. Barr*, No. 18-1595, 2019 WL 6826008 (2d Cir. July 30, 2019); *Ceesay v. Kurzdorfer*, *et al.*, 781 F. Supp. 3d 137, 159–70 (W.D.N.Y. 2025) (explaining that the government failed to comply with applicable regulations in revoking petitioner's release on supervision and that the government's prior promise to provide petitioner with "an orderly departure" entailed an opportunity for petitioner to say goodbye, pack certain belongings, and make preparations for serious health needs).

Here, Petitioner has been detained in ICE custody for the past three years and had only lived in the United States for nine months prior to his initial detention. (*See* Doc. 1, ¶ 31; Doc. 8-1 at 8, 17, 24.) Petitioner's wife and children live in Russia. (*See* Doc. 1-3, ¶ 7.) While he may have some close friends in the United States, it is unclear whether he has extended family in the United States. (*See* Doc. 1; Doc. 1-3.) Additionally, unlike in *Ragbir* and *Ceesay*, Petitioner was never released on supervision *after* his removal order issued, which means he was not assessed for

flight risk or danger. *Cf. Ceesay*, 781 F. Supp. 3d at 169 ("Noncitizens like Ceesay who are released on orders of supervision under section 241.4 necessarily have been found not to constitute either a danger to the community or a flight risk.") (citing 8 C.F.R. § 241.4(d)–(f)). Indeed, at Petitioner's last bond hearing, the IJ found that Petitioner failed to show he was not a flight risk or danger. (*See* Doc. 8-1 at 29). Additionally, an IJ recently found that Petitioner's claims regarding his lack of knowledge or involvement with a suspected ISIS-K smuggler were not credible, as it relates to the national security bar in his case. (*See* Doc. 17-1 at 16–21.)

Finally, unlike in *Ragbir* and *Ceesay*, Petitioner never received a "promise of an orderly departure" embedded in a notice of release on supervision because Petitioner was never released on OSUP after his removal order issued. *Cf. Ceesay*, 781 F. Supp. 3d at 167–69 ("[T]he promise of an orderly departure cannot mean nothing. The Court finds that such a promise must include—at a minimum—the chance to make some preparations for serious healthcare concerns and perhaps the chance to pack certain belongings."); *Ragbir*, 2018 WL 623557, at *2 n.9 (explaining that petitioner had been given an order of release informing him that once a travel document has been obtained, he will be required to surrender to ICE for removal and, at that time, "be given an opportunity to prepare for an orderly departure").

## IV. CONCLUSION AND ORDER

1. Petitioner's motion to proceed via pseudonym (Doc. 19) is **GRANTED**.
2. Petitioner's petition for writ of habeas corpus (Doc. 1) is **DENIED**.
3. Petitioner's motion for immediate release (Doc. 20) is **DENIED**.
4. Respondents' motion to lift the no transfer order (Doc. 18) is **GRANTED**. The Court's temporary order prohibiting Petitioner's removal during the pendency of the litigation (Doc. 5) is **WITHDRAWN**.
5. The Clerk of Court is directed to serve the California City Detention Facility, in California City, California, with a copy of this Order.

///

///

///

6. The Clerk of Court is directed to **CLOSE THE CASE.**

IT IS SO ORDERED.

Dated: _November 18, 2026_

Jennifer L. Thurston
UNITED STATES DISTRICT JUDGE